CHARLES SMITH ET AL. v. THE STATE.

No. 1498. Decided March 27, 1912.

Rehearing Denied May 1, 1912.

**1.—Murder—Province of Jury—Practice on Appeal.**

Every felony case must be tried before a jury which can not be waived even by the defendant; they are the exclusive judges of the facts and the weight to be given to the testimony, and where the conviction was sustained by sufficient evidence, the same will not be disturbed on appeal, and the Appellate Court must necessarily consider the effect of the testimony in a favorable light to sustain the verdict.

**2.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, there was sufficient evidence to sustain the verdict, and the court fully charged the law applicable to the facts, including that of circumstantial evidence and alibi, there was no error.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*Johnson, Barkley & Johnson* and *R. H. & Alice S. Tiernan,* for appellant.—On question of insufficiency of evidence: Lovelady v. State, 14 Texas Crim. App., 545; Brown v. State, 1 Texas Crim. App., 154; Henderson v. State, 14 Texas, 503; Curry v. State, 7 Texas Crim. App., 267; Washington v. State, 16 Texas Crim. App., 376; Stouard v. State, 27 Texas Crim. App., 1; Cardwell v. State, 42 S. W. Rep., 304; Landers v. State, 39 Texas Crim. Rep., 671.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—On March 8, 1911, the appellants, Charles Smith, Steve Woods and Felix Jackson, together with Fred

Manning, were jointly indicted for the murder of Walter Giles in the city of Houston, Harris County, Texas, on February 20, 1911.

After all of the evidence was adduced, the State dismissed the case against Fred Manning, and the appellants, Smith, Woods and Jackson, were each convicted of murder in the second degree and their punishment fixed at seven years each in the penitentiary.

The sole question in the case is whether or not the evidence is sufficient to sustain the conviction.

Our law expressly requires that every felony case shall be tried before a jury and does not permit even the defendant to waive a jury trial. Our law also provides that the jury in all cases are the exclusive judges of the facts proved, and of the weight to be given to the testimony. Code Criminal Procedure, articles 786 and 734. This is properly so, because the jurors and the judge of the trial court have all the witnesses present before them. They see and hear them, observe their manner of testifying and can better tell than any other, the weight and credit to be given to their testimony. They hear for each side, the argument of the respective attorneys, criticising, commenting upon and summing up the testimony. At best, the writing down in cold type of what has been said by these witnesses before the jury to be read by this court is, in many instances, but a brief and imperfect statement by the witness. It can not portray the looks, the manner, the appearance and bearing of the witness. This can alone be done and shown before the jury. Hence, this court can not judge of the testimony like it is and should be by a jury and the judge of the trial court. Therefore, this court is in effect, prohibited from passing on the credibility of the witnesses and the weight to be given to their testimony. All this court can do, or is authorized to do, is to determine from what is written down and sent to us, whether as a legal proposition, it is sufficient to sustain the verdict. This court, under the proper rules of law, is required and must necessarily consider the effect of the testimony in a favorable light to sustain the verdict. Otherwise, it would be assuming and usurping a power and authority that is not given it.

The statement of facts in this case embraces seventy pages of typewritten testimony. It is, therefore, impracticable to give even the substance of all this testimony, and as we see our duty we will give the substance of only that part of it which tends to support the verdict, assuming, as we must, that where there is contradictory testimony, it was not believed by the jury and they gave no credence thereto.

There are some facts in the case which are shown practically without controversy. It might be stated that they were well established. The deceased was a brakeman on a freight train; that on the night of February 20, 1911, the train was being hauled south through, what we take from the testimony to be the south part of the city

of Houston, and that the street over which the train was being hauled at the time was devoted largely, at least, to the tracks of the several railroads that run through the city of Houston. That on said night the deceased was shot with a 41 caliber shot, the ball passing entirely through his body, which practically immediately rendered him unconscious; that he was then taken by others to a sanitarium, and from this shot died a few days later; that freight cars of the railroad company had been, prior to that night, robbed and the company had persons engaged on the ground and on the trains passing along where the deceased was shot that night for the purpose of detecting and preventing these robberies; that at the time the deceased was shot, several shots from pistols were fired by different persons and that it was shown that three persons, if not more, were seen to do this shooting.

The testimony of one State's witness, Nelson, in effect, shows that he was one of the parties engaged by the railroad to detect who it was robbing the railroad cars; that shortly, perhaps some fifteen or twenty minutes, before the deceased was killed he detected one party on a train and that this party fired a pistol at him and shot him in the arm, which caused him to fall off of the car, and then two other shots without effect were fired at him; that there appeared to be at least two persons besides the one that shot at him on this train and that they were acting together apparently preparing, or in the attempt, to rob the cars; that some ten to twenty minutes after he was shot the train on which the deceased was a brakeman—this was a different train from the one this witness was shot on—was pulled south along the same street where the party was who shot and shot at him, and that he saw at least five or six shots fired in the direction of where it turned out deceased was when he was shot as this train was passing along. He was not close enough to these parties during this firing to identify any of them, nor could he give an accurate description of their appearance or the clothes they wore. It appeared to him that they wore soft hats without brims. Under the circumstances he was not attempting to get an accurate description of them, but seemed more to be trying to keep out of their view to prevent being shot himself. The man that shot at him was a colored man, a negro. He could not tell how many persons were engaged in the other shooting. When he first went along before he attempted to get on the train himself and before he was shot, when the train was passing along which he was riding when he was shot, there were some six negroes about at one of the cross streets, but it was not at this point where any of the shooting occurred; that when deceased was killed there were five or six shots fired in rapid succession; that he could see the flashes of the guns as they were fired. He could not swear how many different guns were fired, but there were different flashes and different guns. He did not undertake to positively identify either of the appellants as the persons who did the

shooting that night or as the persons who shot him that night, but he did point out Felix Jackson, one of the appellants on the trial, as having the appearance and build of the one who shot and shot at him. He pointed out also Fred Manning as similar in build and somewhat of the appearance as one of the men he saw in the crowd of six or more before any shooting took place. He was positive that Felix Jackson was the man of the appearance and build of the man that shot him that night. His size agreed with the size and build of that man, but he did not swear that he was that man. From where he was shot and the place where the shooting of the deceased occurred was some five or six blocks distant from where he first saw six or more negroes at one of the cross streets.

Mayfield, another State's witness, who was in the employ of the companies, seeking to detect the robberies, among other things, testified that while the train was passing on which Nelson was riding, he being where he appeared to be secreted, one negro got off of the train right close to him. On the car next to the one Nelson was on was another negro and he holloed to this man who got off the car, to get on and he did so. The man that got off of this car and then got back on had on a slicker and a cap. He stood in about three feet of the witness when he got on the car. The man on the train who holloed to him to get on was hanging on the side, but he could not give a description of how he was dressed other than he had dark clothes on. There were three or four of these negroes. One was about three cars from the engine hanging on the truss rod and on to the handhold of the car and had a bar in his hand trying to break the seal of the car. He saw that, as the car passed him, the train moving. That man had on dark clothes. He believed there were four of them all told, but he could not swear to it. The second man was on the car about twelve or fifteen cars from the engine and this car was the car, north of the one Nelson was on, and it was this man that got off beside the witness. He knows there were three of these negroes, but could not swear that there was a fourth one; he was positive there were three and maybe there were four. They all went south on that train. Soon after the train passed him he heard shooting. At that time there were three shots fired. He went down that way. Later he heard more shooting, several shots; could not say how many. He then left the railroad tracks and went back to the roundhouse to telephone, and he was then informed that Nelson had been shot. The train had gotten about two blocks from him before he heard the first shooting, and it was five or ten minutes afterwards when he heard the second shooting. He was too far to see the flash from any of these shots, but heard them. The second of the three negroes who were on the train that Nelson was on when shot was on the first or second car north of the man who was on about the third car from the engine. The three negroes who were on the sides of these cars as they were

passing along were on different cars. One on about the third car from the engine, the next on the second car back north of Nelson, and the third, the one who dropped off, right near him; none of them were on top of the cars when he saw them. He knows all three of these men were negroes, because they all passed close to him and he could see and tell that they were negroes. He did not undertake to swear positively that any of these three men were the appellants. The man who got off of the car right by him was tall, taller than the witness, who was five feet eight inches tall, and must have been about six feet tall.

. Louis Jones, another State's witness, who was a passenger brakeman on one of the railroads in Houston, remembered the occurrence of the shooting of the deceased. The night of the shooting he was in the locality where the shooting occurred and was going to his room about three doors from the railroad tracks. Before reaching his room he met two men. One a tall man with a slicker on and another with a pair of yellow overalls on. He spoke to the tall man, was right close to him and saw, as he was crossing the street, that he had a pistol in his hand. The smaller man, who had on a pair of yellow looking pants and a cap, he did not speak to. He himself did not hear the shooting, but after he got to his room one of the parties in the house asked him if he heard the shooting going on, and it was that night he heard of the shooting of the deceased. The shooting occurred about forty or forty-five minutes after he met these two men.

Lucy Perry, a State's witness, testified that she knew the appellant Jackson; did not see him the night of the shooting, but did the next day at her house where he stayed. The next morning he brought her a bundle and told her to let it stay there until he came back. A pistol was in this bundle; he did not come back, but another dark-looking man came and got it. She did not know the man who got this pistol, but heard that it was Smith.

Reyneaud, another witness for the State, who was a detective in the police force of the city of Houston, and was such at the time of the shooting of the deceased, made an investigation of the matter and participated in the arrest of the appellants, Smith, Woods and Fred Manning. At that time he took a slicker from the house where Woods was staying. This was in the afternoon of February 24, and was just after he arrested a woman and Steve Woods, appellant. The woman and this appellant were walking down one of the streets at the time. The slicker was produced and identified before the jury by this witness on the trial.

Peyton, another witness for the State, testified that he was also a detective on the police force of the city of Houston and was at the time this killing occurred. He made the arrest of the appellants, Smith, Woods and Jackson. Others, among them, Reyneaud, assisted him. He took from some of them a slicker and a cap. The

slicker and cap were from Jackson's house; also he took a pair of yellow overalls. When he arrested appellant Woods on the day after deceased died, he says: "We went out to Friedman's place—they generally hang around there—and we got the information they had left Friedman's and gone down the other street; I mean Friedman's place. So I looked down the street, myself and Mr. Reyneaud, and we saw somebody looked like him going down McKinney Avenue, and I borrowed a horse from a fellow that was deputy sheriff here and ran down and overtook him; caught him just after he crossed the railroad track on McKinney Avenue and he started to run; he ran a little piece and threw his hand back like that, and when he did I pulled my gun on him, when he said: 'Mr. Peyton, I ain't got anything but a baseball;' that is what he had in his hand; he ran thirty or forty yards, maybe not so far."

He got a gun (pistol) supposed to be appellant Jackson's, which was carried by him to the woman, Lucy Perry. He got the gun from Ed Brockett three or four days after the killing.

Ed Brockett testified that Henry Smith brought this pistol to him wrapped up in a paper a day or two after the shooting. Henry Smith and appellant, Charley Smith, are brothers; they never came back to get the pistol and he turned it over to the witness Peyton.

Frank Bouldin testified that he knew the appellant and remembered the occasion of the killing of the deceased. He saw the appellants at Friedman's saloon for some time before the killing; at that time each of them had a pistol; at about 7 or 7:30 o'clock the night of the killing, they left said saloon, going down the railroad track on McKinney Street; when they left said saloon on this occasion the three appellants left with Fred Manning, the other party who was jointly indicted with them; that Felix Jackson had on yellow overalls, a corduroy cap and black slicker; the overalls and cap were then produced before the witness and he identified them and testified that they were appellant Jackson's. Two slickers were then produced and one identified by him as that of Steve Woods. He was not sure whether it was Woods' or Jackson's. That after these three appellants had left said saloon with Fred Manning going down the railroad track in the direction of where the deceased was shot, that the three together returned to Friedman's saloon about 8:30, having been gone about an hour from the time they left there. They came back from the same direction and on the same street that they left on, and were running when they returned. The witness had remained at this saloon during the time that they were gone; when they left he told Charley Ross he was going to stay and see what was going to happen; when the three appellants returned they passed this witness some six or seven steps and went into the shadow of a building and huddled up together, and then each worked his pistol and removed therefrom, and threw, down on the ground, the empty shells therefrom. He saw and heard them doing this at the time.

As soon as they removed the empty shells from their pistols and reloaded them the three appellants then went into Friedman's saloon. The next night he saw appellant Jackson at Parnell's place, on Shepherd Street, in Houston, and heard him there state that appellant Charley Smith had been arrested and the first black son-of-a-bitch that turned him up he would kill him. That when they left Friedman's saloon at about 7:30 the night of the killing they left in Fred Manning's wagon, but neither Manning nor his wagon returned at the time the three returned running, as stated above, and he never saw Fred Manning until about four weeks thereafter. When they returned about 8:30 the night of the killing they came back in a rush and ran from the direction of where the shooting and killing had occurred; that after these three appellants had returned, as stated, in a short time afterwards the ambulance, with the sheriff and policemen accompanying, passed along the street at Friedman's saloon carrying the deceased to the sanitarium. None of the officers then stopped at this saloon. This witness soon afterwards left this saloon and went home. The reason he happened to notice the three appellants when they left Friedman's saloon about 7:30 the night of the killing, was that Felix Jackson holloed, "Let's go, boys," and then it was that the three appellants left in Manning's wagon; that after they removed the empty shells and reloaded their pistols he knew what they were doing therewith because he saw them put their hands in their bosoms and he knew they were putting the pistols therein because he used to do the same way.

Parnell, another witness for the State, testified that his place was 250 or 300 yards from the railroad track, and that he remembered the night of the shooting there in the railroad yards. Appellant Felix Jackson came to his place that night; he rushed in and at the time was alone; at the time he came in he had a black slicker coat under his arm and asked the witness' wife if he could leave his coat there and she told him he could. He then hung the coat behind the door and went into the kitchen where the witness' little girl was, and she asked him if he heard the shooting, and he replied that he did, and when she asked who it was he said that it was he, that he had done that shooting; that the witnesses Bouldin and Jackson were around the witness' place the next night and that appellant Jackson said that they had arrested appellant Charley Smith, and the witness asked him if said Smith had been arrested, and Jackson replied, "Yes, and I will kill the black son-of-a-bitch that turns me up," and he, witness, then said to Jackson that he, witness, did not believe Charley did any shooting, but that he, Jackson, had turned himself up by coming to the witness' place the other night and talking to everybody. That the night before he had come in there, left his slicker and then said what he did to the witness' little girl, he staying there only about five minutes and then went and got his

slicker and left his, witness', place. That this, the witness', place was four or five hundred yards from said Friedman's saloon.

Ross, another witness for the State, testified: That in February, 1911, he worked in his brother-in-law's barbershop, located on Mc-Kinney Street, about fifty feet from Friedman's store; that he was at Friedman's store at 6:30 the evening of the killing and saw the appellants, Jackson, Woods and Smith, there; that he then saw Jackson with a gun, but did not see either of the other parties then have a gun; that he knew Jackson had one because he drew it on the witness on that occasion. Jackson was dressed at that time in a yellow corduroy cap, and yellow shirt, and yellow pants; the cap and pants, as produced and identified by the other witnesses, were then produced and identified by this witness. On cross-examination this witness said that he did not see the appellants Woods and Smith and Fred Manning there at the time Jackson drew the pistol on him, but he had seen them there together nearly all that evening; that the others had left Friedman's store when Jackson drew the gun on the witness; that Bouldin was there on the outside at that time. The witness remained at Friedman's only some twenty minutes after the gun was drawn on him. After the witness started home he saw the appellant Woods and told him of Jackson's drawing the pistol on him, and Woods told witness that he had seen Jackson around on St. Charles Street and tried to get him to apologize to the witness for drawing the gun on him; that at the time he met the appellant Woods, Woods was going to Friedman's saloon, coming from up McKinney Street from Betts'. This witness also said that at the time he was at Friedman's saloon at about 6:30 that night he saw there a wagon to which was hitched a mule that he had for some time before then seen Fred Manning driving and hauling with and that Manning at the time claimed the wagon and mule.

The appellants each testified. Each of them admitted that he was at Friedman's saloon from along about night, the night of the killing, but claimed that they did not leave there that night at all until 10 or 11 o'clock, when each went to his home. They also introduced Friedman, who testified substantially to the same thing. From the testimony of these appellants and Friedman, it appears · that there was a large number of negroes at Friedman's saloon that night, a larger number than usual, and that there was a good deal of drinking and carousing around. Fred Manning also testified to substantially the same thing and denied that he had a wagon and mule there that night and denied that the appellants had left Friedman's saloon at the time testified to by the State's witnesses, with him in his wagon.

As is usual in cases of this character, there was some contradiction of the State's witnesses, Bouldin and Ross, but all of this was for the jury and was doubtless discussed in detail by able attorneys, both for the State and for the appellant. The jury must have been,

because there is no complaint whatever that they were not, intelligent, wholly disinterested, impartial and fair jurors. The eminent judge who presided also heard all of this evidence, saw the witnesses and their manner of testifying, and their demeanor; heard the arguments of attorneys for both sides and he, on a motion for new trial, which attacked the judgment and verdict solely because the evidence was insufficient to sustain the verdict, under the sanction of his official oath and with a long and extensive experience, held, by overruling the motion, that the evidence was sufficient to sustain the verdict. Under the circumstances and viewing our duty as we do, we can not say that the jury and trial judge have erroneously held that the evidence in this case is not sufficient to sustain the verdict.

The court gave a full and apt charge to which there is no exception whatever. In it he correctly charged on circumstantial evidence and alibi.

It is unnecessary for us to discuss, with any detail, the evidence in the case. We have carefully gone over it and studied it and in our opinion the evidence is sufficient to sustain the verdict. So believing, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied May 1, 1912.—Reporter.]